**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gila River Indian Community,<br><br>Plaintiff,<br><br>v.<br><br>Sylvia Matthews Burwell, et al.,<br><br>Defendants. | No. CV-14-00943-PHX-DGC<br><br>**ORDER** |

Defendants move to dismiss two claims that relate to their duty to fund Indian healthcare services. Doc. 30. Defendants' motion is fully briefed and the Court heard oral argument on February 11, 2015. The Court will grant the motion in part.

**I.   Background.**

This lawsuit revolves around funding for contract healthcare services that Plaintiff Gila River Indian Community ("the Community") has provided to members of the Tohono O'odham Reservation. Doc. 28. The Community is a federally recognized Indian tribe. *Id.*, ¶ 12. Until 1995, Indian Health Services ("IHS") had provided healthcare for Community members and operated a hospital in Sacaton, Arizona. *Id.*, ¶ 30. The Community then entered into a self-governance contract with IHS pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"). *Id.*, ¶ 32; *see* Pub. L. No. 93-638, 88 Stat. 2203 (1975) (as amended, 25 U.S.C. § 450 *et seq.*). This contract allowed the Community to take control of its healthcare services and the hospital, with the support of federal funds. Doc. 28, ¶ 32. In 2002, the Community

entered into a self-governance "compact" with IHS pursuant to ISDEAA amendments that Congress recently had passed. *Id.*, ¶ 47; Pub. L. No. 106-260, 114 Stat. 711 (2000) (25 U.S.C. § 458aaa *et seq.*). The compact granted the Community greater autonomy in providing healthcare services. Doc. 28, ¶¶ 47-50.

Since the Community assumed control of its healthcare services, members of the Tohono O'odham Reservation have received care at the Community's hospital as well as contract healthcare services paid for by the Community. *Id.*, ¶ 34. The funding agreements – which were entered into annually by the Community and IHS under the self-governance contract and compact – never specifically identified funding for the contract healthcare services for Tohono O'odham members. *Id.*, ¶¶ 33, 36, 39.

In 2013, the Community requested and IHS agreed to additional funding for contract healthcare services for Tohono O'odham members. *Id.*, ¶ 52. For the 2014 Funding Agreement, the Community again requested additional funding for these services. *Id.*, ¶ 54. IHS declined this request and also declined to delineate what portions of the 2014 Funding Agreement were allocated to healthcare services for Tohono O'odham members. *Id.* On November 15, 2013, the Community sent IHS a "Final Offer" which contained an amendment to the 2014 Funding Agreement. Doc. 28-1. The proposed amendment required IHS to delineate what amounts in the funding agreements from 1996 to 2014 were allocated to healthcare services for Tohono O'odham members. *Id.* If IHS failed to do this, or evidence showed that the funding had been deficient, the amendment required an additional $963,114 for the 2014 Funding Agreement and reimbursement for the deficiencies in the previous funding agreements. *Id.*

IHS rejected the Final Offer and the proposed amendment. Doc. 28, ¶ 58. After further negotiations failed, the Community filed this lawsuit. In its amended complaint, the Community seeks injunctive and declaratory relief under three causes of action: (1) violation of 25 U.S.C. § 458aaa-6 by failing to approve the amendment to the 2014 Funding Agreement; (2) violation of 25 U.S.C. § 458aaa-6 by failing to sever the portions of the amendment that were acceptable to Defendants; and (3) breach of various trust

duties owed to the Community. *Id.*, ¶¶ 70-82. In parts of the complaint, the Community also claimed that it was entitled to reimbursement for funds spent on healthcare services for Tohono O'odham members. *Id.* ¶ 69.

Defendants now move to dismiss the Community's breach-of-trust claim and its requests for reimbursement, arguing that the Court lacks subject-matter jurisdiction over these claims. Other than the reimbursement remedy, Defendants do not ask the Court to dismiss the Community's claims for violation of the ISDEAA.

## II.   Subject-Matter Jurisdiction.

Defendants are Sylvia Matthews Burwell, Secretary of the Health and Human Services Department, and Yvette Roubideaux, Acting Director for IHS. Doc. 28, ¶¶ 13-14. Because the Community sues them in their official capacities, sovereign immunity may bar portions of this lawsuit. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 89 (1989) (finding that "an official-capacity action is in reality always against the State"). Subject-matter "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity together with a claim falling within the terms of the waiver. The terms of consent to be sued may not be inferred, but must be 'unequivocally expressed.'" *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citations omitted).

The ISDEAA contains a waiver of sovereign immunity in 25 U.S.C. § 450m-1(a). Under this statute, the federal government waives its immunity and grants district courts "original jurisdiction over any civil action or claim against the appropriate Secretary arising under [the ISDEAA]." *Id*. The statute also grants district courts, subject to the provisions of the Contract Disputes Act, 41 U.S.C. §§ 7101-09 ("CDA"), jurisdiction "over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter." *Id.* This waiver of immunity extends to claims arising under self-governance compacts. *Id.* § 458aaa-10(a).

Under Rule 12(b)(1), Defendants may move to dismiss the case for lack of subject-matter jurisdiction. "A Rule 12(b)(1) jurisdictional attack may be facial or

- 3 -

factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* In resolving a factual attack on jurisdiction, the Court "may review evidence beyond the complaint without converting the motion to dismiss to a motion for summary judgment." *Id.*; *see Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). The Court, however, may not resolve genuine factual disputes if the jurisdictional issue and substantive issues are intertwined unless the motion to dismiss is converted to a motion for summary judgment. *See id.*; *Safe Air for Everyone*, 373 F.3d at 1039-40 n.3.

The parties' briefing is difficult to characterize. Although Defendants appear to mount a facial attack on subject matter jurisdiction, that focus is not always clear. The parties dispute various factual matters throughout their memoranda and often frame their arguments in terms of failure to state a claim. The Court will not tarry long on this ambiguity. The essential issues are whether the Community has pled a cognizable breach-of-trust claim and whether its claim for reimbursement may be asserted only under the CDA. The Court concludes that the Community has not pled a viable breach-of-trust claim. The claim will therefore be dismissed both because it does not fall within the limited waiver of sovereign immunity in § 450m-1(a) and for failure to state a claim. The Court concludes that the Community's reimbursement claim complies, at least on its face, with the statutory requirements for asserting a claim under the ISDEAA, and therefore cannot be dismissed at this stage of the litigation on the ground that it may be brought only under the CDA.

**III. Analysis.**

    **A. Breach of Trust.**

Defendants argue that the general trust relationship between the government and Indian tribes does not give rise to a breach-of-trust claim. Although statutes speak of the

- 4 -

government's general duty to provide healthcare to Indians, Defendants argue that many cases have found this statutory language insufficient to sustain a breach-of-trust claim. Defendants further argue that such a claim cannot lie unless there is an underlying trust corpus the government is administering for a tribe, such as Indian property or trust assets.

The Community's view of a breach-of-trust claim is fairly simple and premised entirely on language from *United States v. Navajo Nation* ("*Navajo I*"), 537 U.S. 488, 506 (2003). Quoting from that case, the Community asserts that "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id*. at 506. The Community points to several statutes and regulations that allegedly establish "specific fiduciary or other duties" that Defendants allegedly violated, including: (1) 42 C.F.R. § 137.144, which requires IHS to share "all relevant information with the Indian Tribe in order to avoid rejection of a final offer"; (2) 25 U.S.C. § 458aaa-6(c)(1)(B), which requires IHS to provide "technical assistance" to a tribe in order to overcome a rejection of a final offer; (3) § 458aaa-4, which states that a tribe is to "receive full tribal share funding" for healthcare services; and (4) § 458aaa-6(f), which requires that IHS pass on to the tribe the money IHS saves due to a tribe's performance of a self-governance compact. The Community argues that the general trust relationship as described in 25 U.S.C. §§ 450n, 1601, and 1602 reinforces the conclusion that the cited statutory and regulatory provisions establish actionable fiduciary duties.

The Court cannot accept the Community's argument. For two reasons, the Court concludes that *Navajo I* does not support the breach-of-trust claim asserted in this case.

First, *Navajo I* makes clear that a mere substantive source of statutory or regulatory duties is not sufficient to give rise to a breach-of-trust claim. Applying the holding of *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206 (1983), *Navajo I* held that a breach-of-trust claim arises when statutes and regulations "impose *judicially enforceable fiduciary duties* upon the United States and its management of [tribal land]." *Navajo I*, 537 U.S. at 504-05 (emphasis added). The Supreme Court explained that these

duties were created in *Mitchell II* from a "network" of statutes and regulations that gave the federal government "'full responsibility to manage Indian resources and land for the benefits of the Indians.'" *Id.* at 505 (quoting *Mitchell II*, 463 U.S. at 224).  The statutes and regulations in *Mitchell II* not only entrusted the federal government with the management of tribal forest lands, but also directed the government to manage the lands so as to serve "the needs and best interests of the Indian owner and his heirs" taking into account a series of specified factors including the state of growth of the timber, the highest and best use of the land, and the present and future financial needs of the owner. *Id.* (citation and quotation marks omitted).  The Bureau of Indian Affairs was to engage in "daily supervision over the harvesting and management of tribal timber," and proceeds from timber sales were to be paid to tribal landowners "or disposed of for their use and benefit."  *Id.* (citation and quotation marks omitted).  As summarized in *Navajo I*, the relevant statutes and regulations "combined to place under federal control '[v]irtually every stage of the process.'"  *Id.* (quoting *Mitchell II*, 463 U.S. at 222).  *Mitchell II* accordingly held that the government had assumed trust responsibilities for management of the lands in question.

The plaintiff in *Navajo I* sought to impose similar trust responsibilities on the federal government's obligation to approve mineral leases on tribal lands under the Indian Mineral Leasing Act of 1938 ("IMLA").  The Supreme Court rejected the attempt because the IMLA and its regulations were much less comprehensive than the statutes and regulations in *Mitchell II*.  They "simply require[d] Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective, and authorize[d] the Secretary generally to promulgate regulations governing mining operations."  *Id.* at 507 (citations omitted).  The Court explained:

> The IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that *Mitchell II* found adequate to support a claim for money damages.  The IMLA simply requires Secretarial approval before coal mining leases negotiated between

> Tribes and third parties become effective, and authorizes the Secretary generally to promulgate regulations governing mining operations. . . . Unlike the "elaborate" provisions before the Court in *Mitchell II*, the IMLA and its regulations do not "give the Federal Government full responsibility to manage Indian resources . . . for the benefit of the Indians." The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure "the needs and best interests of the Indian owner and his heirs."

*Navajo I*, 537 U.S. at 507-08 (citations omitted). Because the obligations imposed on the federal government by the IMLA and its regulations were far less comprehensive than the laws at issue in *Mitchell II*, the Supreme Court held that no claim for breach of trust could be asserted. *Id.* at 506-508.

The statutes and regulations in this case, like those at issue in *Navajo I*, simply do not give the federal government full responsibility to manage Indian resources for the benefit of Indians. According to the Community, the relevant statutes and regulations require IHS to share information, provide technical assistance, provide a full tribal share of funding for healthcare services, and pass on to the tribe money saved by the tribe's performance of the compact. Such provisions do not constitute an elaborate statutory and regulatory scheme that places the federal government in full control of managing tribal resources as was found necessary in *Navajo I*.

Nor can the government's general trust obligation provide the missing elements of the Community's breach-of-trust claim. *Navajo I* made clear that the general trust obligation can "reinforce the conclusion that the relevant statute or regulation imposes fiduciary duties," 537 U.S. at 506 (quotation marks omitted), but it is not sufficient to support that conclusion in the absence of comprehensive statutes and regulations. Thus, the Community's argument that the general trust relationship is recognized in the ISDEAA or other Indian healthcare legislation (Doc. 32 at 11) does not enable the Court to find a cognizable breach-of-trust claim in this case.

The federal government "assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *United States v. Jicarilla Apache*

- 7 -

1  *Nation*, 131 S. Ct. 2313, 2325 (2011).  The Court cannot conclude that the statutes and
2  regulations relied on by the Community show that the United States has accepted trust
3  responsibilities for the healthcare related duties the Community seeks to enforce.

4  Second, breach-of-trust claims recognized by the Supreme Court and Ninth Circuit
5  involve an underlying corpus of Indian property or funds managed by the federal
6  government.  For example, *Mitchell II* involved the federal government's full control
7  over tribal forest lands.  463 U.S. at 210, 225.  The Supreme Court found that "[a]ll of the
8  necessary elements of a common-law trust are present:  a trustee (the United States), a
9  beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)."
10 *Id.* at 225.

11 In *White Mountain Apache Tribe*, an Indian tribe claimed that the federal
12 government had breached its fiduciary duties to "maintain, protect, repair, and preserve"
13 property on the Fort Apache Military Reservation.  537 U.S. at 469.  A statute stated that
14 this property was to be "held by the United States in trust for the White Mountain Apache
15 Tribe."  *Id.*  The Court found that the statute supported a breach-of-trust claim:  "While it
16 is true that the [statute] does not . . . expressly subject the Government to duties of
17 management and conservation, the fact that the property occupied by the United States is
18 expressly subject to a trust supports a fair inference that an obligation to preserve the
19 property improvements was incumbent on the United States as trustee."  *Id.* at 475.

20 Ninth Circuit precedent is similar.  In *Marceau v. Blackfeet Housing Authority*,
21 540 F.3d 916 (9th Cir. 2008), for example, the Ninth Circuit found that a tribe's breach-
22 of-trust claim failed because "the federal government held no property – land, houses,
23 money, or anything else – in trust.  The federal government did not exercise direct control
24 over Indian land, houses, or money by means of these funding mechanisms.  The federal
25 government did not build, manage, or maintain any of the housing."  *Id.* at 928.[1]

---

[1] The Community cites *Skokomish Indian Tribe v. United States*, 410 F.3d 506 (9th Cir. 2005), for the proposition that a treaty violation, without any trust corpus, is sufficient to support a breach-of-trust claim.  *Skokomish* is irrelevant for two reasons. First, it concerned a claim for breach of a treaty.  *Id.* at 510-11.  There is no such claim in

- 8 -

These cases comport with traditional trust law. Black's Law Dictionary defines a trust as "a property interest held by one person (the *trustee*) at the request of another (the *settlor*) for the benefit of a third part (the *beneficiary*)." Black's Law Dictionary 1647 (9th ed. 2009). It further explains that "[f]or a trust to be valid, it must involve specific property[.]" *Id.* The Restatement of Trusts similarly explains that a trust "is a fiduciary relationship with respect to property[.]" Restatement (Third) of Trusts § 2 (2003).[2]

This case does not involve a traditional corpus. There is no property or money held in trust by the federal government for the benefit of the Community. This case does involve appropriations Congress makes to IHS, part of which are used to fund tribal self-governance compacts for healthcare. Such an appropriation has some similarities to a trust corpus – the government holds money and is directed by statute to use it for the benefit of Indian tribes. Furthermore, Congress has declared a national policy "to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy," 25 U.S.C. § 1602(1), and has passed various statutes relating to Indian healthcare such as the ISDEAA.

The Court cannot conclude, however, that a general appropriation by Congress, without more, satisfies the corpus requirement of a trust claim. A congressional appropriation of government funds is qualitatively different from the tribal-owned real property managed by the government on behalf of Indian tribes in *Mitchell II* and *White Mountain*. The appropriation consists of moneys of the United States, and cannot be said to constitute property of the tribes when it has not been set aside in trust as tribal property. Appropriations to IHS are made on behalf of Indians generally, unlike the

---

this case. Second, it did not hold that the claim was for breach of trust or would be cognizable as a trust claim. It instead held that the Ninth Circuit lacked subject-matter jurisdiction and transferred the case to the Court of Federal Claims. *Id.* at 511.

[2] The Court recognizes that the trust relationship between the United States and Indian tribes "is defined and governed by statutes rather than the common law," *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323 (2011), and therefore does not wish to overstate the importance of the Restatement and similar sources. The Court nonetheless considers it relevant that trusts traditionally require a corpus, something clearly lacking in this case.

specific lands that the government was required to manage on behalf of particular tribes. The Community does not allege that a specific portion of the appropriated funds has been earmarked to fund the Community's self-governance compact with IHS.

In addition, the Supreme Court has distinguished "between money appropriated to fulfill treaty obligations, to which trust relationship attaches, and 'gratuitous appropriations,'" to which a trust relationship does not automatically attach. *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (quoting *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 80 (1908)). In *Quick Bear*, the Court addressed a "gratuitous appropriation of public moneys for the purpose of Indian education . . . under the heading, 'Support of Schools[.]'" 210 U.S. at 66. The Court found that the appropriation "relates to public moneys belonging to the government," and distinguished it from money the government had set aside in trust for Indians. *Id.* Here also, the general appropriation for IHS are public moneys belonging to the government, not funds set aside in trust for the Community.

Furthermore, if a gratuitous appropriation could serve as a basis for a breach-of-trust claim, Indian tribes theoretically could sue the government for breach of trust whenever the government violated a statute or regulation addressing how to spend the appropriation. Every violation of a statute or regulation would constitute a breach of trust.[3] Without clear authority to support such a conclusion, the Court cannot conclude that a breach-of-trust claim arises from every statutory or regulatory violation.

In summary, the Court finds that the Community's breach-of-trust claim fails on two accounts. The Community has failed to identify the kind of elaborate, full-control statutes and regulations that were held necessary for a breach-of-trust claim in *Navajo I*.

---

[3] The Community quite plainly adopts this expansive view of government trust obligations: "Rather than identifying statutes that impose verbatim the fiduciary duties alleged, the Community is only required to identify a substantive source of law imposing a duty on IHS, and allege its breach (which is in turn informed by the common law)." Doc. 32 at 13. This is not correct. As explained above, *Navajo I* makes clear that a plaintiff cannot state a breach-of-trust claim merely by alleging breach of a statutory or regulatory duty. 537 U.S. at 507-08.

In addition, the Community has failed to allege an underlying corpus to support its trust claim. As another court has explained, albeit in different circumstances, the ISDEAA does not "convert the underlying statutory programs into entitlements fairly analogized to a trust corpus." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1368 (Fed. Cir. 2005). The Community's breach-of-trust claim will therefore be dismissed.[4]

### B. Claim for Reimbursement.

Defendants move to dismiss two paragraphs in the Community's complaint that Defendants argue are essentially claims for reimbursement. These two paragraphs state:

> 69. In fact, under the ISDEAA, if GRHC has been providing services to Tohono O'odham members that were the financial responsibility of the Tucson Area IHS Office, Gila River is entitled to the money saved by IHS.
>
> * * *
>
> [Prayer for Relief] Plaintiff Community prays for the following relief… 3. Injunctive and declaratory relief compelling IHS to approve the Community's proposed 2014 Funding Agreement amendment that . . . (3) to the extent no documentation or formulae can be provided to validly support prior year expenditures for CHS care provided to Tohono O'odham members, an increase to the current year funding levels to make GRHC whole for any deficiencies.

Doc. 28 at 16, 19. Because these paragraphs state a claim for monetary reimbursement, Defendants argue, they are subject to the requirements of the CDA and should be dismissed for failing to comply with the CDA's exhaustion requirement. Doc. 30 at 14 (citing 41 U.S.C. § 7103).

The ISDEAA allows an Indian tribe to bring suit in federal court for IHS's failure to accept a final offer. Section 458aaa-6(b) states that "[i]n the event the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary." 25 U.S.C. § 458aaa-6(b). If the Secretary rejects a final

---

[4] Because the Court will dismiss the Community's breach-of-trust claim for reasons set forth above, the Court will not address the second part of *Navajo I*'s test: "whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Navajo I*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 219).

- 11 -

offer, the Secretary must "clearly demonstrate" in writing that one of five reasons for rejecting it applies. *Id.* § 458aaa-6(c). After a "hearing on the record" regarding the final offer, the ISDEAA allows a tribe to either pursue an administrative appeal or "directly proceed to initiate an action in a Federal district court pursuant to section 450m-1(a) of this title[.]" *Id.*

The Community submitted the Final Offer to Defendants on November 15, 2013. Doc. 28-1. The offer contained a proposed amendment to the 2014 Funding Agreement. *Id.* Paragraph five stated:

> In the absence of supporting data or other evidence confirming that the current [funding agreement] and prior year FAs include funds for the provisions of CHS services to [Tohono O'odham] members . . . the Secretary hereby agrees to provide additional funding to [the Community] in an amount sufficient to reimburse [the Community] for all FA amounts already expended in excess of funded amounts for the provision of those services in FY 2014 and all prior years, plus interest.

*Id.* at 4. IHS rejected the Final Offer on January 7, 2014, asserting that "'the amount of funds proposed in the final offer exceeds the applicable funding level to which the tribe is entitled under this title.'" Doc. 28-2 at 2 (quoting 25 U.S.C. § 458aaa-6(c)(1)(A)(i)). After a hearing (Doc. 28, ¶¶ 59-61), the Community filed this lawsuit and claimed that Defendants improperly rejected the Final Offer and the proposed amendment (*id.*, ¶¶ 70-75). Thus, all of the Community's actions closely track the requirements of the ISDEAA, which states that the Community may "directly proceed to initiate an action in a Federal district court pursuant to section 450m-1(a) of this title[.]" 25 U.S.C. § 458aaa-6(c)(1)(C).

Although the remedy the Community seeks – approval of the final offer, including possible reimbursement of funds spent on CHS services for Tohono O'odham members – could result in the Community receiving financial reimbursements for prior-year underpayments, the Community has complied with the express wording of the ISDEAA's jurisdictional provisions. Many of Defendants' arguments to the contrary go to the merits of the Community's claim that the Final Offer should be approved. But because the

1  parties have not fully briefed the merits of the Community's Final Offer, and questions of
2  fact remain outstanding, the Court declines to rule on those arguments. At this stage, the
3  Court will not dismiss the Community's requests for reimbursement.[5]

**IT IS ORDERED THAT** Defendants' motion to dismiss (Doc. 30) is **granted** as to the Community's breach-of-trust claim, and **denied** as to the Community's requests for reimbursement.

Dated this 6th day of March, 2015.

_____
David G. Campbell
United States District Judge

---

[5] The Court does not foreclose the possibility that arguments made at the summary judgment stage may implicate the issues raised in Defendants' motion to dismiss. For example, the Community itself notes that the Court will be required to decide whether the prior compacts included funding for Tohono O'odham members. If so, the Community's claim may more appropriately be characterized as a claim for breach of the prior compacts than amendment of those compacts, a characterization that could lead to the conclusion that the claims must be asserted under the CDA. The Court agrees with the Community's argument that a decision on such issues now would be premature. Doc. 32 at 17.

- 13 -